UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEVENTH GENERATION, INC., <br>                                  Movant, <br><br>             v. <br><br> GENERATION GOOD, N.F.P., <br>                             Respondent. | CASE NO. _____ <br><br> CASE PENDING IN NORTHERN DISTRICT OF ILLINOIS: <br> No. 1:16-cv-9358 |

**MEMORANDUM OF LAW IN SUPPORT OF SEVENTH GENERATION, INC.'S
RULE 45 MOTION TO QUASH AND/OR MODIFY SUBPOENA SERVED
BY <u>RESPONDENT GENERATION GOOD, N.F.P. ON SOCIAL MEDIA LINK, LLC</u>**

Seventh Generation, Inc. ("Seventh Generation") – Movant here and the Defendant in the underlying action, *Generation Good, N.F.P. v. Seventh Generation, Inc.*, No. 1:16-cv-9358 (N.D. Ill.) – submits this Memorandum of Law in support of its motion under Rule 45(c) of the Federal Rules of Civil Procedure to quash and/or modify the Subpoena to Testify at a Deposition in a Civil Action served on non-party Social Media Link, LLC ("SML") by Plaintiff in the underlying action (Respondent here), Generation Good, N.F.P. ("GG").

**I.     PRELIMINARY STATEMENT**

This Motion relates to a subpoena issued in a trademark dispute between GG, a small non-profit organization in Chicago, and Seventh Generation, a leading national brand of household and personal care products that help protect human health and the environment.  GG has sued Seventh Generation, alleging that Seventh Generation's use of the mark GENERATION GOOD in connection with its popular online community and conversation forum available to registered users at www.generationgood.socialmedialink.com infringes upon GG's asserted rights in the mark.  In a set of counterclaims, Seventh Generation contends that

GG does not hold any valid rights in the mark and GG's use actually infringes on Seventh Generation's own trademarks.

The subpoena is directed to SML, a Seventh Generation contractor that hosts Seventh Generation's Generation Good™ community (the "Community"). Among other things, the subpoena demands production of certain confidential and privileged communications between SML and Seventh Generation related to the Community and the underlying lawsuit, as well as confidential information that individually identifies the users of the Community. Seventh Generation seeks to quash those requests here.

First, information responsive to the subpoena includes a handful of confidential communications between Seventh Generation and SML that were made at the direction of Seventh Generation's litigation counsel to further efforts to assess GG's legal claims and Seventh Generation's defenses in this litigation, or discuss the advice of Seventh Generation's litigation counsel relating to the dispute. Those communications are clearly protected from disclosure by the work product doctrine and Fed. R. Civ. P. 26(b)(3). GG's efforts to circumvent Rule 26(b)(3) by seeking them through a third-party subpoena should be rejected.

Second, GG's request for the confidential information personally identifying the Community's participants is, at best, highly unlikely to produce any useful information, and at worst, an attempt to gain leverage over Seventh Generation by needlessly annoying and potentially alienating its customers. Seventh Generation's and its users' substantial interest in maintaining the confidentiality of that information outweighs GG's minimal interest in disclosure. The Court should therefore quash or modify the subpoena to prevent disclosure of this information.

## II.     BACKGROUND

### A.     Seventh Generation and the Generation Good™ Community

Seventh Generation is a leading purveyor of household and personal care products under its SEVENTH GENERATION® brand.  Declaration of Maureen Wolpert ("Wolpert Declaration") ¶ 2 (copy attached as **Exhibit 1**).  Seventh Generation has used the mark GENERATION GOOD since at least as early as February 2015 for its Generation Good™ on-line community, which is accessible at www.generationgood.socialmedialink.com ("the Community").  *Id.* ¶ 4.

The Community is available to registered members, of which there are now approximately 350,000.  Wolpert Decl. ¶ 5.  It is in part a "chat site."  It includes a "forum" section in which members converse about mainly lifestyle-related issues, posting comments that often touch on highly personal and sometimes political topics.  For example, recent conversation topics have included: "Have you participated in any causes (charitable or political) in support of preventing breast cancer?; Is adoption in your family plans?; Natural ways to help conceive?; Household finances: Is there a right time to start a family?; Have you had your first mammogram yet?; Did you encapsulate your placenta?; Have you or anyone in your life battled breast cancer?; Advice to pass on about feminine care?."  *Id.* ¶ 6.

Members provide personally identifying information when they register to join the Community, including their addresses, email addresses, and phone numbers.  *Id.* ¶ 7.  However, they participate in the community with the expectation that they may remain anonymous pursuant to Seventh Generation's Generation Good™ community Terms of Service Agreement ("Terms of Service"), which incorporates the Generation Good™ community Privacy Policy ("Privacy Policy").  *Id.*  The Terms of Service states: "The community will never disclose

3

personal identification as outlined in the Privacy Policy without written permission." *Id.*, Attachment A at 1. The Privacy Policy states in relevant part:

> We the Seventh Generation, Inc. Generation Good™ community website and mobile application (otherwise referred to as "we" or "us") recognize the importance of respecting the privacy of those who visit this web site.
>
> \*   \*   \*
>
> We do not allow you to share any profile information except your USERNAME and image on our web site.
>
> \*   \*   \*
>
> We will not disclose personally identifiable information about members with a California mailing address to unaffiliated third parties without your written authorization, unless otherwise permitted by law. Disclosures that are permitted under California law without written authorization include, among others, disclosures necessary to effect, administer or enforce a transaction you request; disclosures to our authorized agents and service providers; disclosures permitted or required by law or disclosures to prevent fraud or illegal activities.
>
> \*   \*   \*
>
> Our site and your privacy settings allow you to make informed choices about who has access to your information. . . . We share your information with third parties only in limited circumstances where we believe such sharing is 1) reasonably necessary to offer the service, 2) legally required, or 3) permitted by you. In addition to the foregoing, we share your information with third parties to the extent that it is anonymized and omits any of your information that would enable identification of you.

*Id.*, Attachment B at 1-2, 4.

SML, the subpoenaed party, is a contractor retained by Seventh Generation to host the Community. *Id.* ¶ 8. SML is not a party to the underlying action. SML is contractually obligated to maintain the confidentiality of information Seventh Generation designates as confidential, which includes individually identifying information regarding Community members, unless disclosure is "compelled by law." *Id.* ¶ 9.

### B. The Plaintiff

GG – the Plaintiff in the underlying action – was a small, Chicago-based start-up nonprofit organization at the time Seventh Generation began using the GENERATION GOOD mark for the Community. The entity was incorporated on December 5, 2014, but apparently remained entirely inactive thru at least early March 2016. *See* Declaration of Karen Tyler ("Tyler Declaration") ¶ 2, Attachment A at 53, 56 (the Tyler Declaration is attached as **Exhibit 2**). In a Charitable Organization Financial Information Form filed with the Illinois Attorney General's Office Charitable Trust and Solicitations Bureau, it reported $0.00 in Gross Receipts and $0.00 in Assets for the period from its inception thru December 31, 2015. *Id.*, Attachment A at 7. In its application to the U.S. Internal Revenue Service for tax-exempt status under Internal Revenue Code Section 501(c)(3) dated March 8, 2016, it reported future plans to make grants supporting the activities of other charities, but certified that it had engaged in no "past or present activities" as of that time. *Id.*, Attachment A at 53.[1]

### C. The Underlying Action

In the underlying action, GG claims that Seventh Generation's use of the trademark GENERATION GOOD constitutes trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and Illinois statute and common law. *See generally* Compl., *Generation Good, N.F.P. v. Seventh Generation, Inc.*, No. 1:16-cv-09358 (N.D. Ill. Filed, Sept. 29, 2016) [hereinafter "GG Complaint"] (copy attached as **Exhibit 3**).

GG alleges trademark infringement primarily under a theory known as "reverse confusion." *See* GG Compl. ¶ 46. "The 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among the

---

[1] Notwithstanding its failure to list any activities on its tax forms, GG has taken the position in this litigation that it has conducted some preliminary charitable activities in the local Chicago area, but nothing that would establish a local or national presence of the same magnitude as Seventh Generation's.

relevant class of customers and potential customers."  *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992).  In the typical case, "the confusion alleged is 'forward confusion,' which occurs when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services." *Id.* at 48 (citations omitted). In such a case, "the junior user attempts to capitalize on the senior user's good will and established reputation by suggesting that his product comes from the same source as does the senior user's product."  *Id.*

>Conversely, "reverse confusion" happens:
>
>when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark. Nonetheless, the senior user is injured because the public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Id.* (citations omitted).  Reverse confusion is the only conceivably viable theory of trademark infringement in this matter, given that GG was only a seed of an organization with no established market presence, customers, or reputation upon which Seventh Generation could possibly seek to capitalize at the time Seventh Generation began using the GENERATION GOOD mark.

      C.      **<u>GG's Subpoena on SML</u>**

GG's subpoena on SML demands production of "all records, documents, electronically stored information or tangible things . . . relating to, referring to, or evidencing . . . the actual and target members of the [community located at www.generationgood.socialmedialink.com], including demographic data."  July 25, 2017 Subpoena Served on Social Media Link LLC (the "SML Subpoena"), at Exhibit B ¶ 3 (a copy of the SML Subpoena with accompanying exhibits is attached as **Exhibit 4**).  This demand encompasses individually identifying information

regarding Community members in SML's possession.  Counsel to GG has declined Seventh Generation's request to limit the scope of the subpoena to demographic data regarding Community members, excluding individually identifying information.[2]

The subpoena also demands production of "communications between Seventh Generation and Social Media Link regarding the Generation Good project."  SML Subpoena, at Exhibit B ¶ 5.  Some such communications are likely to include individually identifying information regarding Community members.  Moreover, Seventh Generation has already responded to GG's requests for production of this same information in discovery in the underlying action, and claims attorney work product privilege over a handful of communications as detailed on the privilege log attached to the Wolpert Declaration.  Wolpert Declaration, Attachment C.  Counsel to GG has declined Seventh Generation's request to limit the scope of the subpoena to exclude these privileged communications.[3]

GG's attorneys have indicated that they intend to survey Community members in order to establish the likelihood of confusion element of GG's trademark infringement claims.  For reasons further explained below, such a survey is both unnecessary and highly unlikely to produce relevant information.  Moreover, Seventh Generation believes that GG's contacts with Community members in connection with this litigation, which will inevitably alert them to the disclosure of their individually identifying information in violation of their reasonable expectation that Seventh Generation would not disclose such information to third parties, is

---

[2] Counsel conferred regarding this issue in correspondence dated August 10, 2017, August 11, 2017, and August 28, 2017, and by telephone on August 30, 2017, but have been unable to reach agreement as to the issues raised in this Motion.

[3] Counsel also conferred regarding this issue in correspondence dated August 10, 2017 and August 11, 2017, and by telephone on August 30, 2017, but have been unable to reach agreement.

likely to significantly damage Seventh Generation's relationship with Community members. Wolpert Declaration ¶ 10.

### III.   ARGUMENT

#### A.   <u>Seventh Generation Has Standing.</u>

Seventh Generation has standing to move to quash the subpoena. "A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests." *United States v. Raineri,* 670 F.2d 702, 712 (7th Cir. 1982); *see also U.S. v. Nektalov*, No. S203CR.828(PKL), 2004 WL 1574721, at *1 (S.D.N.Y. 2004). Specifically, a party has standing to quash a subpoena issued to a nonparty if the party has a claim to privilege, or a proprietary interest in the information sought, or the subpoena implicates privacy interests. *reFX Audio Software, Inc. v. Does,* 1-111, No. 13 C 1795, 2013 WL 3867656, at *1 (N.D. Ill. 2013); *Nektalov,* 2004 WL 1574721, at *1 ("Interests considered 'legitimate' in other cases in this District include . . . protecting a privilege or proprietary interest in the material.").

Seventh Generation moves to quash the subpoena issued to SML in this matter to prevent disclosure of communications with respect to which it claims attorney work product privilege, and to protect its proprietary interest in preventing injury to its relationships with Community members that would result from disclosure of their confidential personal information. The U.S. Supreme Court's decision in *Secretary of State v. Munson* is instructive regarding the latter interest. The Court ruled that a professional fundraiser had standing to contest a statute that capped the fee a charity could pay for fundraising services, because the statute was directed at persons with whom the fundraiser had a professional relationship, and impaired him in that relationship. *Secretary of State of Maryland v. Joseph H. Munson Company, Inc.,* 467 U.S. 947, 954-55 (1984). The disclosure of Community members' individually identifying information in

response to GG's subpoena would impact and probably impair Seventh Generation's relationship with those persons. Seventh Generation has standing to contest the subpoena to protect its proprietary interest in preserving those relationships.

Moreover, as further discussed below, Community members who participate in the Community and post comments to the Community forum regarding personal and at times political issues with the reasonable expectation of anonymity have a First Amendment interest in remaining anonymous. Seventh Generation has standing to raise this issue. Prudential limitations on standing are relaxed in the First Amendment context in recognition that contesting actions that may chill free speech is "not primarily for the benefit of the litigant, but for the benefit of society." *Id.* at 2847. Thus, in the above-cited *Munson* case, the Supreme Court allowed a professional fundraiser to argue the First Amendment rights of charities impacted by a statute that capped the fee they could pay for fundraising support, regardless of whether his own First Amendment rights were at stake. *Id.* ("[A] litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court.").

### B.      The Subpoena Is Improper Under the Federal Rules.

Federal Rules of Civil Procedure ("Rule") 26 and 45 govern discovery from nonparties by subpoena. Rule 26 permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. Pro. 26(b)(1); *see also* Advisory Committee Notes to 1991 Amendment to Fed. R. Civ. Proc. 45 (noting a nonparty is subject to the same scope of discovery under Rule 45 as a party under Rule 34).

9

Rule 45 provides that "[o]n timely motion, the court for the district where compliance is required *must* quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. Proc. 45(d)(3)(A)(iii) (emphasis added). Rule 45 further provides that "[t]o protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires disclosing . . . confidential . . . commercial information." Fed. R. Civ. Proc. 45(d)(3)(B)(i).

  1. <u>The Court must quash the subpoena to the extent it demands production of individually identifying information regarding Community members.</u>

Customer lists are not subject to discovery in trademark infringement cases as a matter of course. *See, e.g. Globalaw Ltd. v. Carmon & Carmon Law Office et. al.,* 452 F.Supp.2d 1, 62-63 (D.D.C. 2006) (holding the counter-claim defendant was not required to provide names of its clients and stating "[i]n Lanham Act cases, the names of the defendant's customers or clients are rarely – if ever – revealed."); *Jeff Foxworthy v. Sun Art Designs, Inc.,* No. 96-3372-CIV, 1997 WL 196624, at *1-2 (S.D. Fla. Mar. 4, 1997) (denying motion to compel production of defendants' customer lists when plaintiff intended to contact defendants' customers to develop evidence relating to likelihood of confusion); *J. Lloyd Int'l, Inc. v. Imperial Toy Co.,* No. C06-0043, 2007 WL 2934903, at *2 (N.D. Iowa Oct. 5, 2007) (holding the plaintiff failed to demonstrate its need for information regarding customer identities). Rather, "[c]ourts have taken different views regarding whether such disclosure [of customers lists] will be ordered, depending on the circumstances of the case," and weighing the disclosing party's confidentiality concerns against the requesting party's need for the information. *Klayman v. Freedom Watch, Inc.,* No. 07-22433-CIV, 2007 WL 3343079, at *5 (S.D. Fla. Nov. 12, 2007).

Seventh Generation's confidentiality concerns are substantial with respect to Community members' individually identifying information. As previously discussed, Seventh Generation's Community Terms of Service and Privacy policy promise that Seventh Generation will maintain confidentiality of Community members' individually identifying information. The disclosure of this information in violation of Community members' legitimate expectations is likely to erode their goodwill towards Seventh Generation.

Moreover, GG's ability to obtain information in discovery identifying Generation Good™ community members who anonymously express their opinions within the community is limited by the First Amendment to the U.S Constitution. A court order invoked by private litigants constitutes state action; GG's utilization of the subpoena power is subject to review by this Court for consideration of First Amendment concerns. *See Doe v. 2TheMart.com Inc.,* 140 F. Supp. 2d 1088, 1091–92 (W.D. Wash. 2001); *see also Sony Music Entm't Inc. v. Does 1–40,* 323 F. Supp. 2d 556, 563 (S.D.N.Y. 2004). The Supreme Court has long recognized the right to anonymity as an important component of the freedom of speech and association protected by the First Amendment. *Talley v. California,* 362 U.S. 60, 64 (1960); *Church of Am. Knights of the Klu Klux Klan v. Kerik,* 356 F.3d 197, 208 (2d Cir. 2004) (collecting Supreme Court cases); *see also McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341–43, 357 (1995). The Court has also extended the protections of the First Amendment to speech on the internet. *See Reno v. ACLU,* 521 U.S. 844, 870–71 (1997). In fact, the Supreme Court has observed that the internet provides a unique forum for expression: "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders and newsgroups, the same individual can become a pamphleteer." *Id.* Indeed, the standard for disclosing the identity of an anonymous Internet user

who is not a party to the case is very high: "non-party disclosure is only appropriate in the exceptional case where compelling need for the discovery sought outweighs the First Amendment rights of the anonymous speaker."  *2TheMart.com Inc.,* 140 F. Supp. 2d at 1095.

GG has no compelling need to obtain Community members' individually identifying information.  As previously discussed, GG's attorneys have suggested that they plan to survey Community members to establish the "likelihood of confusion" element of GG's trademark infringement claim.  It is true that the likelihood of confusion can be established with survey evidence.  However, for a survey to be valid, the persons interviewed must represent the opinions which are relevant to the litigation.  *Sam's Wines & Liquors, Inc. v. Wal-Mart Stores*, Inc., 1994 WL 529331, at *6–7 (N.D. Ill. 1994), *citing, Amstar Corp. v. Domino's Pizza, Inc*., 615 F.2d 252, 264 (5th Cir., 1980).  As previously discussed, "reverse confusion" is GG's only viable theory of trademark infringement in this matter in that GG had no established market presence, customers, or reputation at the time Seventh Generation began using the GENERATION GOOD mark.  In a reverse confusion case, the allegation is that the senior user (allegedly GG in this matter) is overwhelmed by a much larger junior user, and injured because the public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter.  *Sands, Taylor & Wood Co.*, 978 F.2d at 957.  The relevant survey population is therefore comprised of *GG's* potential customers, not the actual or potential members of Seventh Generation's Generation Good™ community.  "[W]here . . . the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers. . . .  The court should limit survey evidence in reverse confusion cases to the customers of the senior user." *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3rd Cir. 2004)

(noting adoption of this rule by two leading treatises, McCarthy on Trademarks § 32:159; 3A Callmann § 21:67); *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir. 1994)(Where the senior user is concerned about the "traditional" type of confusion (*i.e.,* that the junior user is selling its products as if they come from the senior user), the relevant market consists of the junior user's customers.  In contrast, when the issue is whether consumers mistakenly believe that the senior user's products actually originate from the junior user ("reverse" confusion), the appropriate universe consists of the senior user's customers).

Even if GG did argue "forward confusion" in this matter, it would not be required to survey the opinions of actual members of the Community.  Rather, it would be sufficient to survey potential Community members.  *See*, *e.g., Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 518–19 (S.D.N.Y. 1993) (in a trademark infringement case concerning trademarks used for Jordache and Levi jeans, respectively, courts finds a "mall-intercept" survey format of people who have purchased jeans in general within the past six months is acceptable, though survey is flawed for failure to include persons planning to purchase jeans in general in the future).

GG does not need to know the mailing addresses, phone numbers, and email addresses of individual Generation Good™ community members in order to prove its claims in the underlying action.  GG therefore cannot establish a need for this information sufficient to overcome Seventh Generation's confidentiality concerns related to its proprietary interests, and certainly not a compelling need sufficient to override Community members' First Amendment interest in anonymous speech on-line.  GG's insistence upon invading the privacy of 350,000 people through disclosure of information for which GG has no compelling or even significant need in

the underlying action would seem to be mainly a tactical attempt to gain leverage over Seventh Generation in settlement negotiations, which the Court should not sanction.

### 2. The Court must quash the subpoena to the extent it demands production of privileged communications.

The communications at issue are emails in which, at the direction of Seventh Generation's attorneys, Seventh Generation employee Maureen Wolpert requests information from SML employee Rich Fetter to assist Seventh Generation's attorneys in preparing the company's defense in this matter, and Mr. Fetter responds in his capacity as Seventh Generation's contracted consultant and agent; and communications in which Ms. Wolpert discusses her understanding of Seventh Generation's attorneys' advice relating to the dispute and asks Mr. Fetter to implement it. The work product privilege extends to these documents "prepared in anticipation of litigation . . . by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. Pro. 26(b)(3); *See BASF Aktiengesellschaft v. Reilly Industries, Inc.*, 224 F.R.D. 438, 441 (S.D. Ind. 2004) (work product privilege applies to letter to a third party prepared under direction of counsel, seeking information needed to prepare defense to litigation).

## IV. CONCLUSION

For all of the foregoing reasons, Seventh Generation respectfully requests that the Court grant its Motion to Quash the subpoena GG served on SML, limiting its scope to exclude individually identifying information concerning Community members, and the handful of privileged communications identified herein. In addition, Seventh Generation asks the Court to order GG to destroy or return to Seventh Generation any information in either of these two categories that SML does produce in response to the subpoena.

Dated September 7, 2017.

                                        **Baker & McKenzie LLP**

                              By:   s/Jacob M. Kaplan
                                    Jacob M. Kaplan
                                    Baker & McKenzie LLP
                                    452 Fifth Avenue
                                    New York, NY 10018
                                    Telephone:  (212) 626-4100
                                    Fax:  (212) 310-1600
                                    Email: jacob.kaplan@bakermckenzie.com

                                    *Attorney for Seventh Generation, Inc.*